PEOPLE'S FERRY COMPANY *vs.* EBENEZER H. BALCH.

Upon a contract in writing, by which the subscribers " agree to pay the sums set against their respective names, to such persons as shall be authorized to receive the same, for the establishment and support of a new ferry from East Boston to Boston, the location of which shall be determined by the committee recently appointed at a meeting of the citizens; provided sufficient is subscribed for the purpose; the same to be represented by the certificates of stock to be created by the company hereafter to be organized," a corporation, established after the date of the agreement, cannot maintain an action against one who subscribes it after such organization, for the amount of his subscription, at least until a sufficient sum has been subscribed to pay for all lands, structures and boats of the ferry, free of incumbrances.

ACTION OF CONTRACT by a corporation, established by *St.* 1853, *c.* 422, passed on the 25th of May 1853, to recover $500, being the amount of the defendant's subscription to the following agreement in writing: " We, the undersigned, agree to pay the sums set against our respective names, to such persons as shall be authorized to receive the same, for the establishment and support of a new ferry from East Boston to Boston, the location of which shall be determined by the committee recently appointed at a meeting of the citizens; provided sufficient is subscribed for the purpose; the same to be represented by the certificates of stock to be created by the company hereafter to be organized. East Boston, January 1st 1853."

At the trial in the superior court, at January term 1856, before *Huntington,* J., it appeared that this agreement was signed by the defendant in June 1854, but by some of the other subscribers in the winter of 1853, before the plaintiffs obtained their act of incorporation; that the plaintiffs organized as a corporation in July 1853, and established by-laws, one of which provided that the capital stock should be divided into shares of twenty five dollars each, the whole of which should be paid in at the issuing of the certificates, and should not afterwards be subject to any assessments; that the only assessments ever made upon the capital stock, were sixteen per cent. in August 1853, sixty per cent. in October 1853, and twenty four per cent. in June 1854. It did not appear how much stock was subscribed for before the

organization, or that the defendant ever had notice of any of the assessments; but payment of the defendant's subscription was demanded of him, and refused.

It appeared that in 1853 and the early part of 1854 the plaintiffs purchased and took land for their landing places, made contracts for the building of their boats, drops and slips, and for doing all other work necessary to complete the ferry, at an expense, in all, of $265,200. It did not appear that any plans were changed, or new contracts made, after or in consequence of the defendant's subscription. But the work was carried on vigorously from that time, according to the original plans, and the ferry was opened in October 1854.

There was evidence tending to show that the defendant, about a month before signing, was called on, by one of the directors, to subscribe to stock of the People's Ferry, and refused to do so till he could look into the matter; and that the understanding was, that he should do so, and give his answer to that director when he next saw him. But there was no direct evidence that the defendant, when he signed the agreement, knew of the charter, or of anything that had been done by the plaintiffs under it, or in regard to the ferry; and no evidence that the defendant ever attended any of the meetings of the stockholders, or took any part in the doings of the company.

The corporation did not, at any meeting, authorize any form of agreement for subscription, but the books which had been used before the charter were afterwards continued and circulated by the directors, and the subscribers so obtained were treated as subscribers by the plaintiffs, and many of them paid for and took their stock, and the subscription books had ever since been in the custody of the officers of the company, as belonging to them. The nominal amount of subscriptions contained in these books was about $153,000, and, including some verbal agreements to take stock, did not exceed $175,000. There was no evidence that the amount of the capital stock of the company had been fixed by any vote of the directors or stockholders.

Upon the evidence introduced, (of which so much is above

stated as is material to the understanding of the questions de-
cided by this court,) the defendant contended that this action
could not be maintained, because,

1st. The plaintiffs were not a party to the contract; that its
terms excluded them, and that it was not competent for the
plaintiffs to contradict, vary or explain the written contract by
parol, and show that the plaintiffs were the company intended

2d. The contract was without consideration.

3d. There was no mutuality in the contract.

The court instructed the jury, "that it was competent for
the plaintiffs to show that the writing was signed by the de-
fendant at a time other than its date; that, on the question
of mutuality, it was necessary that the minds of the con-
tracting parties should meet; that upon the terms of this
subscription paper, the amounts being payable to persons to
be authorized to receive it, a contract to pay the plaintiffs
might be implied, taken in connection with the evidence in
the case; that the corporation could adopt and ratify the con-
tracts of subscriptions, and the plaintiffs claimed there was
evidence tending to show this; that if the plaintiffs were au-
thorized to collect these subscriptions, and were the beneficial
owners at the time of the defendant's subscription, and he
never revoked the same, and if the subscription paper was pre-
sented to the defendant by a person duly authorized by the
plaintiffs to obtain subscriptions, and if the defendant, for a
consideration good in law, knowing that he was dealing with
an agent of the plaintiffs, put his name to the paper, intending
to become an associate in the corporation, and the plaintiffs
adopted the subscription, expended moneys, made contracts,
purchases and outlays, and incurred liabilities, for the purpose
of establishing and supporting a ferry, as set forth in the arti-
cles of subscription, and if the plaintiffs had also adopted and
ratified the other subscriptions, then existing, as well as the de-
fendant's, it would be sufficient in law to create a contract, so
far as mutuality is required; that, as to the consideration, the
general rule was, that a benefit to one party, or damage or loss
to the other, would constitute a sufficient consideration; that a

26 *

consideration might be shown by parol, though not expressed in the instrument; and that payments by other subscribers, the plaintiffs' proceeding with the enterprise, making purchases, incurring expenses, building boats, purchasing real estate, foi the purpose of establishing and supporting the ferry, and a readiness to admit the defendant to membership, would consti-tute a legal consideration."

The defendant also contended that, by the conditions of the agreement, the plaintiffs must show "that a sufficient amount of subscriptions for stock, genuine *bona fide* subscriptions, was obtained to establish and support the ferry, without a resort to credit." The plaintiffs contended that a determination or de-cision by the corporation or their directors, that a sufficient sum had been raised to establish and support a ferry, was conclusive upon the defendant; that the success of the enterprise was evi-dence of it. And they offered to show that the board of directors had so resolved; but it did not appear to have been done at a meeting of the board.

The court ruled "that this provision in the subscription paper was a condition precedent; that the plaintiffs or their directors were not, so far as related to the liability of the defendant, the tribunal to determine whether a sufficient sum had been raised; that the jury must be satisfied that written subscriptions suffi-cient were obtained at the time of the demand made upon the defendant for payment; that what sum was sufficient was a question of fact for them to determine; and it was submitted to them, whether it should not be such sum as men of ordinary caution, prudence and sagacity, with competent knowlédge of the nature and character of the enterprise, and applying these qualities to the subject matter in hand, would deem necessary to establish and maintain a ferry at the place designated by the charter and contract; that the subsequent success or failure of the enterprise would not be a controlling element in deciding upon the question of sufficiency; that it was not to be taken that the corporation were never to use their credit or borrow, but such a sum was to be raised as would place the corporation out of the reach of those fluctuations which attend a business

done on mere credit, and which, in certain states of the money market, operate to check or put a stop to the enterprise ; and that, in the different and conflicting results and amounts arrived at by each side from the books and evidence, they must examine carefully for themselves in deciding upon the sufficiency of the sum raised to comply with the condition."

The jury returned a verdict for the plaintiffs, and the defendant alleged exceptions.

*A. A. Ranney,* for the defendant, cited *Chester Glass Co.* v. *Dewey,* 16 Mass. 94 ; *Atlantic Cotton Mills* v. *Abbott,* 9 Cush. 423 ; *Ives* v. *Sterling,* 6 Met. 310 ; *Phillips Limerick Academy* v. *Davis,* 11 Mass. 113 ; *Machias Hotel* v. *Coyle,* 35 Maine, 405 ; *Instone* v. *Frankfort Bridge,* 2 Bibb, 570 ; *Wallingford Manuf. Co.* v. *Fox,* 12 Verm. 304 ; *New Bedford & Bridgewater Turnpike* v. *Adams,* 8 Mass. 138 ; *Essex Turnpike* v. *Collins,* 8 Mass. 292 ; *Bridgewater Academy* v. *Gilbert,* 2 Pick. 579 ; *Hamilton College* v. *Stewart,* 1 Comst. 581 ; *Middlebury College* v. *Williamson,* 1 Verm. 212 ; *Middlebury College* v. *Loomis,* 1 Verm. 189 ; *Foxcroft Academy* v. *Favor,* 4 Greenl. 383.

*R. Choate & B. F. Russell,* for the plaintiffs. On a promise to pay money to a corporation, or to whomsoever may be appointed to receive it, any corporation or appointee subsequently created may sue, unless the defendant notifies his intention not to be bound. *Thompson* v. *Page,* 1 Met. 565. *Ives* v. *Sterling,* 6 Met. 310. *Bryant* v. *Eastman,* 7 Cush. 114. *Watkins* v. *Eames,* 9 Cush. 537. *Chester Glass Co.* v. *Dewey,* 16 Mass. 94. *Northern Railroad* v. *Miller,* 10 Barb. 260. 2 Parsons on Con. 61. Offers of reward and notes payable to bearer are familiar examples of this rule. Parol evidence is admissible for the purpose of showing that the plaintiffs are the party intended at the time of the contract, and have been brought into existence in the mode then contemplated. The paper declared on is to be read in the light of the history of the transaction, and the attending circumstances, including its date, and the time of signature. It is a promise made in June 1854, to pay to some one to be appointed after January 1853 by a corporation created after January 1853. It speaks of " certificates of stock to be

created by the company hereafter to be organized," which could only be a corporation — and the promise to pay " such persons as shall be authorized," may well include a corporation. Rev. Sts. c. 2, § 2, cl. 13. Does not this paper come within that exceptional class of commercial instruments, which are to be construed by the jury? *Brown* v. *M² Gran*, 14 Pet. 479. *Etting* v. *Bank of United States*, 11 Wheat. 59.

The objection of want of mutuality is groundless. There were two contracting parties ; each known to the other. The requisites to mutuality were accurately stated by the presiding judge.

The consideration was sufficient. *Holyoke Bank* v. *Goodman Paper Manuf. Co.* 9 Cush. 579. *Andover Academy* v. *Cowles*, 6 Pick. 427. *Ives* v. *Sterling*, 6 Met. 317. *Kennebeck & 'Portland Railroad* v. *Jarvis*, 34 Maine, 360. 1 Parsons on Con. 377, 378 & notes.

There was no error in the instructions, relating to the condition precedent of the sufficiency of the subscription, of which the defendant can take advantage. The question of such sufficiency under such a contract is, by the assent of each subscriber, referred to and to be determined by the majority, in will and interest, of the associates ; and the defendant, having subscribed after such determination had been made, and the work was in a course of vigorous prosecution by a corporation, was precluded from putting that question to the jury ; or this was at least *prima facie* evidence of the sufficiency. *Great Northern Railway* v. *Kennedy*, 4 Exch. 417. Without resorting to the subscription papers, the sufficiency of funds was shown *prima facie* by the determination of the plaintiff corporation that there was a sufficiency, the successful prosecution of the enterprise, the fact that the greater part of the sums subscribed had been paid in, the actual large receipts of money from the stockholders, and the other evidence in the case. This *prima facie* case the defendant did not undertake to answer. The evidence admitted was competent; and the test of sufficiency stated in the instructions was not laid down as a fixed rule of law, but was a sound and just comment on the evidence, to assist the jury in deciding the question of fact submitted to them.

SHAW, C. J.   This is an action brought by the plaintiff corporation, to recover $500, a subscription towards the stock of a company first associated without an act of incorporation, but which afterwards became regularly incorporated, for the purpose of establishing a ferry from Boston to East Boston.

The first question is, whether this action will lie by this corporation on the subscription paper stated.   It is not an action against the defendant for unpaid assessments, as against an actual member of the company; nor an action to recover damage for refusing to become a stockholder and take shares; but upon a promise or executory contract to pay a certain sum of money, to some person authorized to receive the same, for the purpose stated.

The paper is in the words following : " We, the undersigned, agree to pay the sums set against our respective names, to such persons as shall be authorized to receive the same, for the establishment and support of a new ferry from East Boston to Boston, the location of which shall be determined by the committee recently appointed at a meeting of the citizens; provided sufficient is subscribed for the purpose; the same to be represented by the certificates of stock to be created by the company hereafter to be organized.   East Boston, January 1st 1853."

The words quoted, including the date, constituted the heading of a subscription book, and the name of the defendant, with the number of shares and the sum, was the genuine signature of the defendant, after other intervening signatures.

It appears that this paper writing, which bears date of the 1st of January 1853, was actually signed by the defendant in June 1854.   In the mean time, between these two dates, the circumstances of all parties concerned had greatly changed, as appears from the case stated in the bill of exceptions.

It is extremely difficult to put any satisfactory construction upon such an instrument, or to determine what are the relative obligations and rights of any persons under it.   The rule undoubtedly is, that an instrument takes effect from the time of its execution and delivery; and in order to give effect to this rule, it is settled that the date, even of a deed, is not conclusive evi-

dence of the time of execution, and that other evidence may be given of the time of the actual execution.   Sometimes the fiction of *nunc pro tunc* may be resorted to, and the party executing on one day may be held as if it had been done on such previous day, where the circumstances remain the same, so that the contract may be carried into effect, consistently with the manifest intentions of the parties.   But where great changes have taken place, so that the performance of the contract has become impossible, or where it cannot be carried into effect, so as to accomplish the manifest intent of the parties, such rule will not apply.   We will endeavor to consider it under various aspects.

1.  Taking this paper as an instrument, whether a contract with anybody or not, executed in June 1854, and taking its effect as of that day, we are of opinion that no action can be maintained upon it by the plaintiff corporation.   This company had then become duly incorporated and organized, capable of contracting and being contracted with ; and no promise being made to them by their corporate name, or any other, or to any person for their use, they cannot sue upon it.   According to the best view which can be taken of it by the plaintiffs, it was a promise to pay a sum of money, as one of a company, for the purpose of establishing a ferry.   Such company might become incorporated, as it actually did, in which case it would, in effect, be an undertaking to become a holder of shares to a certain amount, and the obligation he would incur would be that of paying assessments, *pari passu* with other stockholders ; whereas all the assessments which could be laid had been laid on those who were stockholders in this corporation, and most of them had been paid.   Instead of a stipulation to pay instalments, or to pay, as all other subscribers would be obliged to pay, according to the terms of the subscription paper, it must be construed as an undertaking to pay the whole amount subscribed for, at once.   Instead of a promise to pay the sum subscribed to some person to be authorized by the voluntary association therein mentioned, it must operate as a promise to pay an existing corporation.

All the cases, we think, in which it has been held that an

action would lie against a subscriber for stock, were promises to pay to a company when incorporated, so that it might be considered as in the nature of a standing offer to pay such company when incorporated; and such corporation was formed before such offer was revoked, and the company accepted such offer, and received the subscriber as a member of the corporation, when the contract was complete. *New Bedford & Bridgewater Turnpike* v. *Adams*, 8 Mass. 138. *Essex Turnpike* v. *Collins*, 8 Mass. 292. Here there was no necessity and no occasion for such a mode of proceeding, because the associates had already formed a corporation, for the express purpose, and with a capacity to make any and all contracts incident to the establishment of their ferry.

2. Regarding this as an instrument made as of January 1853, although in fact executed in June 1854, it was still a written instrument, and the defendant can only be bound according to its terms expressed, or reasonably implied. As such, it contemplated a state of things, which, at the time of its actual execution, had passed away and ceased to exist; it looked to a course of things, which had become impossible. It contemplated the procuring of an act of incorporation, because that was one of the convenient modes of proceeding, to which a voluntary association might and would be likely to resort, to facilitate their proceedings, and to which they did resort, which incorporation should embrace all the associates as members, including the defendant. In the formation of such an act, and fixing its terms, the defendant would have an equal voice with the other associates. It looked to an organization, to a choice of directors, to the laying of assessments, to the determination of the question whether money enough had been subscribed to constitute a sufficient fund to warrant the commencement of the enterprise. Whether this determination should be made by the body of stockholders, or by the directors appointed by them, or in any other way, the terms of the subscription looked to a determination of this question in some mode authorized and directed by the stockholders, on any of which questions all the stockholders would have an equal voice, either *per capita*, or in

proportion to the amounts subscribed. These were powers and privileges which the defendant, by the terms of his undertaking, as an engagement for things to be done at times then future, was to enjoy, in common with all the associates. But these had become utterly impossible by intervening events. The act of incorporation had been obtained, the corporation organized, the directors chosen. With or without any determination by the stockholders, the directors, or otherwise, that funds enough had been subscribed, (no evidence of any such determination any· where appearing,) the company had made large purchases and contracts, in which it was not possible that the defendant could have any voice, and therefore it was not the contract into which, by a subscription to that paper, he had come.

3. But whether this be regarded as executed on the 1st of January 1853, or in June 1854, and if there were proper parties to make it a contract, it was a written contract to be construed and carried into effect, according to its terms; and, by its terms, it was conditional. The liability of the defendant, either to contribute capital for a joint stock company, or to take shares in an incorporated company, was made to depend on the expressed condition, " that sufficient is subscribed for the purpose." The whole is to be taken together and to have a reasonable construction, according to the intent of the parties. A sufficient amount must be subscribed. It might never be paid, because some might become unable; but it must be an undertaking, received in good faith, on the part of the company or associates, to take and pay for the sums subscribed. A subscription from a party, with an assurance given him that he should not be called upon, or that it should be optional with him, at a future time, whether to take such shares or not, would not be a subscription in good faith, nor satisfy the condition. Again, what is intended in the contract by the word " sufficient " ? The expression " sufficient for the purpose," if alone, might be a little equivocal; but it is explained by the previous part of the paper, stating that purpose to be " the establishment and support of a new ferry from East Boston to Boston." This was the enterprise; and the plain effect, probably the actual intent,

was, that no one should be liable to pay or contribute anything until money enough was promised, and at least engaged for, to accomplish this enterprise.

Now, as the capital was to be raised, that is, engaged for, subscribed, before the work could be done, or even conclusively contracted for, this clause constituting the condition precedent, must have been understood by the parties, and must now be construed by the court, to mean a sufficient sum, as estimated by persons of competent skill and judgment, with the aid perhaps of offers, and tenders and provisional contracts, and not the actual cost. Then as to the amount, it must be sufficient, as ascertained by such estimates, to meet the necessary outlay, the purchase of land, the cost of buildings, wharfs, ferry ways and other real estate and fixtures, and for the purchase of suitable and proper boats, with their apparatus. It must be such a sum as, according to a fair estimate, when all the land, fixtures and other property purchased should be paid for, and the contracts of the company fulfilled, and their debts paid, would leave them owners of the property, and free of debt contracted on account of these great and necessary original outlays. The court are therefore of opinion, that it was not a compliance with this condition, that a sufficient sum was in good faith, subscribed, such as, in the opinion of the directors, or of the company, or of the jury now, would lead them to believe that they might, with reasonable safety, begin the enterprise, and afterwards, by the aid of the capital actually subscribed and the prospect of success in its execution, would give them a credit, and enable them to raise money sufficient to proceed and complete the enterprise, and place them above the reach of those fluctuations which attend a business done on mere credit, and which, in certain states of the money market, operate to check or put a stop to the enterprise. This, we think, was not the standard of sufficiency contemplated by this contract; it looked to the raising of a capital stock sufficient to meet the cost, and the payment, by each individual, of an aliquot part of that capital; but the actual sum being then uncertain, such estimated amount was taken, instead of a fixed capital in

money. And this was not a merely formal or technical condition, but it was of the essence of the subscriber's contract, and prescribed limits to his liability. To test this, let us examine its practical operation. Suppose, for instance — assuming these numbers for the mere purpose of illustration — that the whole estimated necessary cost of the ferry should be $250,000, that sum would stand in the place of a capital expressed in money. Supposing this divided into 10,000 shares, at $25 each, making the entire capital. The defendant's subscription for twenty shares at $25 = $500 would be $\frac{5}{2500}$, or $\frac{1}{500}$ of the entire stock. But if a money capital subscribed of one half of the cost, with a prospect of success in the enterprise, would give them sufficient credit, so that cautious and prudent men might think it safe to make a beginning, trusting to such credit for the other half, then, when $125,000 were subscribed, they might commence, and must of course go through. The consequence to the defendant would be, that instead of standing responsible for $\frac{1}{500}$ part of this enterprise, and receiving that proportion of the stock, he would stand responsible for $\frac{1}{250}$, or double the amount he engaged for. It would be equivalent to insisting that, though he agreed to take twenty shares, he must take forty. If the enterprise should be a profitable and brilliant one, and the stock above par, this would be no hardship ; but in case it should fall below par, as it might, and it is the only case in which the company would have occasion to require him to take his shares, the answer is obvious, such was not his contract. It is analogous, in principle, to the case where the capital is fixed by the act of incorporation, or the articles of association, at a stated sum in money, with a provision that no subscriber shall be holden till that amount is subscribed. *Salem Milldam* v. *Ropes*, 6 Pick. 23, and 9 Pick. 187.

If, instead of having a sufficient sum subscribed, to cover the estimated cost of the undertaking, they have only enough to enable them, in the judgment of discreet men, to begin the enterprise, say one half, $125,000, and with their credit for an equal sum to complete it, the result would be, that when the whole of these sums should be paid in as subscribed for,

and appropriated, they would stand indebted, in some form, to the amount of one half of the cost of the works. This is the more significant, because there is a provision in the act of incorporation, *St.* 1853, *c.* 422, § 3, restraining the company from issuing new shares at a rate less than par. There would therefore be no means of paying this debt, but an assessment on the existing stockholders, and even, this was prohibited by a by-law. But supposing this by-law to be repealed by the company, and the shares made subject to assessment, the defendant would be liable to double the amount of that for which he would have been liable, if a sufficient amount had been subscribed for, to complete the enterprise, before they begun — contrary to the express condition of his contract.

This principle would not prevent the company from using their credit in making purchases and contracts. It would not be necessary that they should have ready money in all their dealings; but the sum should be such that, when all contracts should be performed, and all real and personal property paid for, and the subscriptions collected, the company should be substantially out of debt, and hold the property free from permanent incumbrances.

An argument, slight perhaps, but tending to the same conclusion, may be drawn from section 9 of the above act, authorizing the City of Boston to purchase this ferry. The city is authorized to purchase the ferry of said company, and all the franchise, property, rights and privileges, by paying them therefor such a sum as will reimburse them the amount of capital paid in, with a net profit, &c. It presupposes that a capital stock shall have been paid in, equal, at least, to the cost; and that the capital stock and the cost of the establishment were equivalent to each other; otherwise the statute would countenance the monstrous proposition, that the city might purchase the establishment on the payment, according to the supposition before made, of half the cost.

Much of the report is taken up with matters relating to the amount subscribed, and to admissions and rejections of evidence, which we have not thought it necessary to examine,

because the report shows that the first contracts and purchases made by the company amounted to $285,000, and there was no intimation on the part of the plaintiffs, that more than $175,000 was subscribed. Much of this was alleged to be colorable, optional with the subscriber, or conditional, or rescinded; but we have not thought it necessary to express any opinion upon these points, because, for the reasons stated, they were immaterial to the issue.

The rulings of the court, under which the verdict for the plaintiffs was found, being in our opinion incorrect, upon the questions whether the action could be maintained by these plaintiffs, and whether the condition of the defendant's contract had been complied with, the verdict must be set aside, and a new trial granted. *Exceptions sustained*